THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| ROBERT A. HORNE, ERIC RICHARDS, | § | |
| and VICTOR CARRELL, | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | **Case No. 4:19-CV-405-KPJ** |
| | § | |
| TEXAS DEPARTMENT OF | § | |
| TRANSPORTATION | § | |
|     Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Texas Department of Transportation's ("TxDOT")

Motion for Summary Judgment with Brief in Support (the "Motion") (Dkt. 56), to which Plaintiffs

Robert A. Horne, Eric Richards, and Victor Carrell (collectively, "Plaintiffs") filed a response

(Dkt. 62), TxDOT filed a reply (Dkt. 72), and Plaintiffs filed a sur-reply (Dkt. 76). Additionally,

TxDOT filed Defendant's Objections to Plaintiffs' Response to Defendant's Motion for Summary

Judgment (the "Objections") (Dkt. 71), to which Plaintiffs filed a response (Dkt. 75). For the

reasons explained below, the Court finds that TxDOT's Motion (Dkt. 56) is **DENIED**.

## I.    BACKGROUND

### A.  FACTUAL BACKGROUND

This suit arises out of TxDOT's involuntary transfer and alleged retaliation against

Plaintiffs and alleged discrimination against Plaintiff Robert A. Horne ("Horne") while Plaintiffs

were employees at TxDOT's Sulphur Springs Yard. *See generally* Dkt. 31.

Horne identifies as being Native American and a descendant from the Alabama Coushatta

tribe. *See* Dkt. 56-1 at 33. Horne began working for TxDOT in April 1995, in TxDOT's Sulphur

Springs Yard. *See* Dkt. 56-3 at 22. In January 2005, Horne was hired as a Sign Technician III, and

he maintained this title until his retirement in April 2018. *See id*. During the timeframe relevant to this suit, Horne was the only Sign Technician III in the Sulphur Springs Yard. *See* Dkt. 56-1 at 29.

Plaintiff Eric Richards ("Richards") began working for TxDOT at its Sulphur Springs Yard in April 2009. *See* Dkt. 56-3 at 22. In 2015, Richards held the title of Engineering Tech II/General Transportation Tech III. *See id*. After his transfer to TxDOT's Emory maintenance office, Richards was promoted to the title of General Transportation Specialist I/Equipment Operator I on March 1, 2018. *See* Dkt. 56-3 at 23; Dkt. 56-4 at 103.

Plaintiff Victor Carrell ("Carrell") began working for TxDOT at its Sulphur Springs Yard in March 2007, and Carrell was promoted to Equipment Operator/General Transportation Specialist I in 2015. *See* Dkt. 56-3 at 23. After being transferred to the Mount Vernon maintenance office, Carrell was promoted to General Transportation Specialist II/Equipment Operator II on March 1, 2018. *See id*.; Dkt. 56-4 at 101.

### 1. **Horne's Work Relationship with Clint Traylor**

In the summer of 2015, the Maintenance Supervisor for the Sulphur Springs Yard, Jeff Dorner ("Dorner"), retired, and Clint Traylor ("Traylor") was hired as his replacement. *See* Dkt. 56-3 at 23. While Dorner was the supervisor, Dorner allowed Horne to make his own work schedule. *See* Dkt. 56-1 at 22. Horne testified that the first two months of Traylor's tenure as his supervisor were "pretty cool," but after that, Horne alleges Traylor "started coming after" him. *Id.* at 24. Horne and Traylor disagreed on which sign repairs were a priority, and Traylor required Horne to leave the Yard earlier to work on signs in the field and come back later in the workday than Horne had been required under Dorner. *See* Dkt. 56-1 at 24–27, 43–45; Dkt. 56-3 at 8. Plaintiffs allege Horne was the only TxDOT employee made to work this strict, longer schedule. *See* Dkt. 62-3 at 25. Horne testified that he and Traylor would both "[get] up close in each other's

2

faces" and would raise their voices at each other. Dkt. 56-1 at 32. Horne testified that he felt Traylor was constantly approaching him with an "aggressive attitude," and Traylor was harassing and discriminating against him. *Id*. at 42, 51.

In early 2016, Traylor completed an Annual Performance Evaluation for all of the employees under his supervision, including Horne. *See* Dkt. 56-3 at 58. In Horne's evaluation, Traylor stated that Horne "needs to improve on the quantity" of his work and "his use of time," as Horne "was too slow to leave the office and back too early in the workday." *Id*. at 65. In the "Employee Comments" section of his evaluation, Horne wrote:

> Austin-TxDOT, Paul [Montgomery], and Paris District:
>
> I would like to say that I do not agree with my evaluation. I am a team player and you can ask anyone that has been with me that I work safe and I do productive work. If the new supervisor would communicate with his employees alot [sic] better and be alot [sic] more honest with them this section would operate better. Mr. [Montgomery] if you could have a meeting with all the guys you will see what I am talking about. Thank you for listening.

*Id*. at 68.

Around February of 2016, shortly after employee evaluations were completed, Traylor asked Horne to help train Clint Tubb ("Tubb") to work on the sign truck. *See id*. at 53–54. Horne allegedly responded: "I heard you gave Clint Tubb a pay raise, you're not happy with the way I'm running the sign truck, why don't you train him the way you want the sign truck to be run." *Id*. at 54. On February 29, 2016, Horne was issued a Documentation of Oral Warning for his refusal to train Tubb. *See* Dkt. 56-3 at 71. Plaintiffs allege Horne was issued this Oral Warning because of his comments about Traylor in his evaluation. *See* Dkt. 63 at 28.

Around March of 2016, Horne told Traylor he did not want to work on the sign truck anymore and that he would work on the mailbox truck instead. *See* Dkt. 56-1 at 38. Traylor allowed Horne to make this job switch. *See id*. Mike Lappin ("Lappin") assisted Horne with the mailbox

truck. *See id*. at 39. Horne alleges he decided to quit working on the mailbox truck after approximately a month or two because Lappin went to management and falsely accused Horne of not keeping the mailbox trucks stocked properly. *See id*. at 39–40. Horne alleges he then went to Stanley Evans ("Evans"), the supervisor in charge of the road crew for the Sulphur Springs Yard, and asked to be placed on the road crew. *See* Dkt. 56-1 at 39–40. Horne testified that after moving to the road crew, his job experience improved because he was no longer reporting to Traylor. *See id*. at 50. After three or four months, Horne reported back to the mailbox truck at the request of Robert McCleskey ("McCleskey"), the Assistant Supervisor for the Sulphur Springs Yard. *See id*. at 51–52; 56-3 at 7.

Evans testified he told Traylor that Horne was Native American and Hispanic. *See* Dkt. 62-2 at 40. Evans further testified that Traylor responded by laughing and said, "I'm going to break him." *Id*. Plaintiffs allege they each complained to Evans about Traylor's discriminatory treatment of Horne prior to Evans' retirement during the summer of 2016; however, Evans testified he only recalled Horne complaining of Traylor's disparate treatment. *See id*. at 29, 39. Evans further testified that Richards and Carrell both complained to him about Horne being retaliated against by Traylor. *See id*. at 33.

### 2. **Collaborative Resolution**

TxDOT District Engineer Paul Montgomery ("Montgomery") testified he "decided to ask a neutral third-party from the Austin Human Resources Division to conduct a collaborative resolution" with the Sulphur Springs Yard once he was made aware of conflicts among the employees. Dkt. 56-3 at 14. As part of this collaborative resolution process, Barb Carleen ("Carleen") conducted several individual meetings with employees in the Sulphur Springs Yard.

4

*See id*. TxDOT alleges that all of the information Carleen gathered from this collaborative resolution process was kept confidential. *See* Dkt. 56-3 at 23.

Plaintiffs allege Richards told Carleen during his interview that Traylor loved to pick on Horne and that Traylor told Evans he was going to break Horne "like a wild Bronc." *See* Dkt. 63 at 17. Plaintiffs allege Richards also told Carleen that a TxDOT employee said the "n word" and Horne reported it, but area engineer Daniel Taylor ("Taylor") did not report it or act on it. *See id*. Plaintiffs allege Horne complained of his treatment by Traylor in his interview with Carleen. *See id*. at 29. Plaintiffs allege Evans reported during his interview that Horne was never offered overtime opportunities. *See id*. at 35. Plaintiffs allege Carrell told Carleen in his interview that Traylor had been "bull dogging" and trying to make Horne miserable since Traylor started working as the supervisor of the Sulphur Springs Yard. *Id.* at 37.

TxDOT alleges no one who was interviewed by Carleen raised concerns of discrimination or retaliation. *See* Dkt. 56-3 at 15. Catherine Hostetler ("Hostetler"), a TxDOT Human Resources Generalist, testified TxDOT would have conducted an investigation if the collaborative resolution process had uncovered allegations of discrimination or harassment. *See* Dkt. 56-3 at 23.

Carleen's notes reflect that several TxDOT employees complained about Traylor's approach to safety and communication around the Sulphur Springs Yard. *See* Dkt. 63 at 4–42; Dkt. 56-3 at 15. Multiple employees also noted that the conflict between Horne and Traylor was causing tension among all employees at the Sulphur Springs Yard. *See id.* At the conclusion of Carleen's interviews, the employees at the Sulphur Springs Yard participated in a final group session with Carleen. *See* Dkt. 56-3 at 23. During this group session, Horne allegedly raised his voice at Traylor and said he could not work for Traylor. *See id*. After Carleen concluded these interviews, TxDOT alleges she shared "the general complaints" made by the employees with Montgomery. *Id.* at 14.

5

### 3. "Clean Slate" Discussion

Montgomery testified that shortly after the collaborative resolution process concluded, he met with all employees at the Sulphur Springs Yard and told them "they needed to move forward and leave the past issues in the past and focus on work." *Id*. at 15. Montgomery further told the employees they needed to listen to Traylor and follow his instructions unless he was instructing them to do something "illegal, immoral, or unethical." *Id*. Evans testified that the gist of Montgomery's discussion with the employees was that they were "starting over with a clean slate," and if anything had happened previously, it "was done with." Dkt. 62-2 at 48. In a letter he later wrote to TxDOT, Horne said Montgomery told the crew that "everyone was on a clean slate from this day forward and everything that had been said and done was over with and we all would work towards the future with everything being good." Dkt. 56-3 at 86. TxDOT alleges that this conversation (the "Clean Slate Speech") "was not in any way intended as a get out of jail free card for illegal or improper things" of which he was not aware. *Id*. at 15.

### 4. Good/Destroy List

Around the time Horne was leaving the mailbox truck and transitioning to a role on the road crew in April or May 2016, Horne created a list on a TxDOT notepad labelling some TxDOT employees as "good" and others as "destroy" (the "Good/Destroy List"). *See* Dkt. 56-1 at 57–58, 66. On the Good/Destroy List, Richards and Carrell are among those listed as "good," while Traylor, Lappin, and Taylor are listed as "destroy." *Id*. at 66. Horne testified he created the Good/Destroy List because he "was frustrated about everything going on" and he felt Traylor, Lappin, and Taylor were "out to destroy [his] career." *Id*. at 57. Horne further testified he wrote the Good/Destroy List out of frustration, and that he never intended to hurt anyone. *See id*. at 58. However, Horne also testified he told Richards and others that he felt Traylor, Lappin, and Taylor

were trying to destroy his career at TxDOT, so he was "going to destroy their career[s] at TxDOT." *Id*. at 59.

On July 5, 2016, a TxDOT employee found the Good/Destroy List in a TxDOT truck; TxDOT placed Horne on paid leave while TxDOT HR and Montgomery reviewed the issue. *See* Dkt. 56-3 at 13, 78. Upon reviewing the Good/Destroy List and talking to Traylor and Taylor, Montgomery testified he decided to allow Horne to continue his employment with TxDOT because Horne assured him that "he would come back and not cause trouble." *Id*. at 15. TxDOT then returned Horne to work, issued Horne a letter reprimanding the Good/Destroy List, and warned Horne against any further behavior that could be considered a threat. *See id*. at 16.

### 5. **TxDOT's Investigation**

On September 28, 2016, Lappin reported to Hostetler that Horne, Richards, and Carrell were allegedly plotting against Traylor. *See* Dkt. 56-2 at 32. Lappin also reported that Horne allegedly drew a target with his finger on TxDOT employee Cameron Gray's ("Gray") back and said "bullseye" a couple months prior. *See id*. at 33. Additionally, Lappin accused Horne, Richards, and Carrell of "bullying the new employees" and "attempting to make their life miserable." *Id*. at 34. Plaintiffs allege Gray and Lappin were lying about Horne drawing a bullseye on Gray's back. *See* Dkt. 62-2 at 68–69. Plaintiffs further allege Lappin also made complaints to Hostetler about Kerry Rumbaugh ("Rumbaugh") and Bryan Patterson ("Patterson") at the same time. *See* Dkt. 62-6 at 2–7.

TxDOT alleges Hostetler presented the accusations to Noel Paramanantham ("Paramanantham"), the new District Engineer, and Paramanantham asked the TxDOT Compliance Division to investigate the claims and take the overall "pulse" of the Sulphur Springs Yard. *See* Dkt. 56-3 at 24; Dkt. 56-4 at 110. Plaintiffs allege TxDOT's sole purpose in conducting

7

the investigation was to amass evidence against Plaintiffs and no other TxDOT employees. *See* Dkt. 62-6 at 19–33.

As part of this investigation, TxDOT Compliance Investigator Curtis Ganong ("Ganong") interviewed twelve employees from the Sulphur Springs Yard between October 20, 2016, and November 2, 2016. *See* Dkt. 56-4 at 114–15. Ganong testified that his overall conclusion after the interviews was that employees felt "Horne, Carrell, and Richards were creating a stressful work environment." *Id*. at 116.

During his interview, Horne allegedly told TxDOT interviewers he believed Traylor and Taylor were out to destroy his career. *See* Dkt. 62-7 at 15. Richards allegedly told the interviewers that "the supervisors have a double standard and not everyone is held accountable to the rules." *Id*.

On December 15, 2016, Paramanantham received the final report from Ganong regarding his investigation into the Sulphur Springs Yard. *See* Dkt. 56-4 at 111. Paramanantham testified that he decided to place Horne on twelve months of probation with a five-day suspension without pay because multiple witnesses confirmed that Horne drew a target on Gray's back, and any threat of violence or physical aggression is not acceptable in the workplace. *See id*. Paramanantham further testified that he decided to give each Plaintiff an option to transfer to other TxDOT offices "so that they could get fresh starts and be productive employees for TxDOT." *Id*.

On December 16, 2016, Hostetler, Taylor, and TxDOT Director of Operations, Tommy Henderson ("Henderson"), met with Plaintiffs individually and offered them each the opportunity to transfer. *See* Dkt. 56-3 at 83. TxDOT alleges Plaintiffs were told there would be no repercussions if they chose to stay at the Sulphur Springs Yard instead of accepting the transfer. *See id*. Carrell was offered the option of transferring to the TxDOT Hunt County Area Office, Richards was offered the option of transferring to the Rains County Maintenance Section, and

Horne was offered a transfer to the TxDOT Delta County office. *See id*. at 83–84. All three Plaintiffs turned down the offer to transfer and chose to remain at the Sulphur Springs Yard. *See id*. at 24.

That same day, Henderson issued Horne a Notification of Disciplinary Action (the "Notification"), wherein Horne received twelve months of probation and a five-day suspension without pay for drawing a bullseye on Gray's back. *See* Dkt. 56-3 at 82. The Notification describes Horne's previous discipline for the Good/Destroy List and his oral warning for refusing to train Tubb. *See id*. Horne was instructed to treat all of his coworkers and supervisors with respect and fairness. *See id.* The Notification contains the following warning: "Any violations of this or any other department policies or procedures will result in further disciplinary action, up to and including termination." *Id*. at 83.

On January 7, 2017, Horne wrote a letter to TxDOT complaining that he was being treated unfairly (the "Letter"). *See* Dkt. 56-3 at 86–87. In the Letter, Horne states: "It is now to the point that I will have to get local city and county government involved and let them know how unfairly I have been done. Everyone that I have spoken with have [sic] said that I have been part of retaliation, discrimination, harassment, and racism." *Id*. at 87. Upon receipt of Horne's Letter, TxDOT directed Horne via email to file a formal complaint. *See* Dkt. 62-8 at 4. Plaintiffs allege Horne never received this email, and thus, never filed a formal complaint. *See id*. at 3. Plaintiffs allege TxDOT then closed his file and never investigated his allegations. *See id*.

### 6.  <u>Involuntary Transfers</u>

After Plaintiffs turned down the offer to transfer, on December 20, 2016, Hostetler received an email from Gray alleging that Horne called him and accused him of lying about the bullseye incident. *See* Dkt. 56-4 at 86. That same day, a supervisor from a different TxDOT office allegedly

informed Hostetler that Carrell asked him if he would become the supervisor at the Sulphur Springs Yard once they got Traylor fired. *See id*. at 89. On January 13, 2017, a TxDOT employee at the Sulphur Springs Yard allegedly told Hostetler that Horne and Richards were pressuring him to take a job as crew leader because they wanted him to help them get rid of Traylor and they did not want to work for Traylor's friend. *See id*. at 92. On February 3, 2017, Hostetler was allegedly informed that Richards stated "they couldn't get that lucky" when he learned that Traylor had not been fired. *See id*. at 93. Paramanantham testified that after receiving these reports, he decided to transfer Plaintiffs to provide each with an opportunity to thrive in a new environment and to return the Sulphur Springs Yard to a productive work environment. *See id*. at 111–12.

On February 17, 2017, Plaintiffs were issued Work Location Transfer Memorandums from Paramanantham. *See* Dkt. 56-4 at 99–104. Each Work Location Transfer Memorandum states that Plaintiffs' "behavior continues to be unprofessional and disruptive to the workplace" despite previous counseling. *Id*. The Work Location Transfer Memorandums go on to state: "In order to maintain a productive and safe work environment for all employees, efficient operations and execution of our mission, and your continued employment, you are being transferred." *Id*. Horne was transferred to the Cooper maintenance office, Carrell was transferred to the Mount Vernon maintenance office, and Richards was transferred to the Emory maintenance office. *Id*.

Horne testified that he continued to work at the Cooper Yard for approximately eight months after he became eligible for retirement because things were "a whole lot better" at the Cooper Yard. Dkt. 56-1 at 63–64. Horne retired in April 2018. *See* Dkt. 56-3 at 22.

On September 19, 2017, Plaintiffs filed charges with the Equal Employment Opportunity Commission ("EEOC") against TxDOT. *See* Dkt. 56-1 at 7–9. In his EEOC Charge, Horne checked boxes indicating that his claim of discrimination was based on race, age, and retaliation.

*See id.* at 7. Richards and Carrell each checked boxes indicating their claims of discrimination were based on age and retaliation.[1] *See id*. at 8–9. Plaintiffs each received Right to Sue letters from the EEOC on March 1, 2019. *See id*. at 10–18.

### B.  PROCEDURAL HISTORY

Plaintiffs filed this lawsuit on June 3, 2019. *See* Dkt. 1. In Plaintiffs' Complaint (Dkt. 1), Horne asserts claims against TxDOT for race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq*., and Richards and Carrell assert claims against TxDOT for retaliation in violation of Title VII. *See* Dkt. 1. On July 1, 2019, TxDOT filed a Motion to Sever (Dkt. 5), seeking to sever Plaintiffs' claims. The Court subsequently denied TxDOT's Motion to Sever without prejudice to TxDOT refiling the Motion to Sever for trial purposes. *See* Dkt. 20.

On December 5, 2019, Plaintiffs filed an Amended Complaint (Dkt. 31), in which Plaintiffs added that Horne is "of Native American and Hispanic descent," and TxDOT discriminated against Horne based on these protected traits and his age. Dkt. 31 at 2. On December 20, 2019, TxDOT filed a Motion to Dismiss (Dkt. 37), arguing that Horne failed to exhaust Title VII's administrative remedies on his added claim for discrimination based on his Hispanic origin. On June 29, 2020, the Court granted in part TxDOT's Motion to Dismiss and dismissed Horne's national origin discrimination claim. *See* Dkt. 86.

On February 5, 2020, TxDOT filed the Motion. *See* Dkt. 56. Trial in this matter is set for November 2, 2020. *See* Dkt. 99.

---

[1] Although Richards and Carrell asserted claims of age discrimination in their Charges of Discrimination with the EEOC, Richards and Carrell only assert retaliation claims in this suit. *See* Dkt. 31.

## II.  <u>LEGAL STANDARD</u>

Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999). The appropriate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). In sustaining this burden, the movant must identify those portions of pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party, however, "need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). The movant's burden is only to point out the absence of evidence supporting the nonmoving party's case. *Stults v. Conoco, Inc.*, 76 F.3d 651, 655 (5th Cir. 1996).

In response, the non-movant "may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255–57). Once the moving party makes a properly supported motion for summary judgment, the nonmoving party must look beyond the pleadings and designate specific facts in the record to show there is a genuine issue for trial. *Stults*, 76 F.3d at 655. The citations to evidence must be specific, as the district court is not required to "scour

the record" to determine whether the evidence raises a genuine issue of material fact. E.D. TEX. LOCAL R. CV-56(d). Neither "conclusory allegations" nor "unsubstantiated assertions" will satisfy the nonmovant's burden.  *Stults*, 76 F.3d at 655.

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *Evans v. Texas Dep't of Transp.*, 547 F. Supp. 2d 626, 636 (E.D. Tex. 2007), *aff'd*, 273 F. App'x 391 (5th Cir. 2008) (citing *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp.*, 477 U.S. at 322). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322–23.

## III. <u>EVIDENTIARY OBJECTIONS</u>

### A.  TxDOT'S OBJECTIONS

TxDOT filed objections to evidence submitted with Plaintiffs' response to the Motion. *See* Dkt. 71.

#### 1.  <u>Exhibits 30, 31, and 34</u>

TxDOT argues Exhibits 30, 31, and 34 are inadmissible hearsay, as a collection of excerpts of interview notes created by Carleen in 2017, because Plaintiffs introduce the statements for the truth of the matter asserted throughout the response to the Motion. *See* Dkt. 71 at 1–3. Plaintiffs contend the documents are not submitted for the truth of the matter asserted, but rather to establish that TxDOT received the reports, yet refused to take action, and because TxDOT created, retained, and produced the document. *See* Dkt. 75 at 1.

Upon review, some of Plaintiffs' citations are not merely to demonstrate receipt of the reports, but rather to characterize the content of the reports, and Plaintiff's other citations are mere

references to the existence of the compilations of interview notes and the information in such notes. As Plaintiffs offer no other hearsay exemption,[2] TxDOT's objection to each reference to Exhibits 30, 31, and 34 offered for the truth of the matter asserted in the identified exhibits is, therefore, **SUSTAINED**. TxDOT's objection to Plaintiffs' citations to Exhibits 30, 31, and 34 that are not offered to prove the truth of the matter asserted in the notes is **OVERRULED**.

### 2.  Paragraphs that Cite Exhibits 30 and 31

TxDOT argues statements in paragraphs that cite Exhibits 30 and 31 (12, 15, 17, 35, 36, and 120) of Plaintiffs' response to the Motion should be stricken because Exhibits 30 and 31 are subject to the Protective Order (Dkt. 42) and the response was not filed under seal and the statements were not designated as confidential information or attorney eyes only. *See* Dkt. 71 at 2. Plaintiffs admit they unintentionally violated the Court's Protective Order. *See* Dkt. 75 at 2. Plaintiffs assert they will work to remove the confidential designation on the documents; however, that in and of itself does not cure the violation as filed. *See id*.

While the response is not designated as "Sealed" on the Docket Sheet, the Court notes the response appears to have been filed under seal. *See* Dkt. 62. Further, Plaintiffs have offered to correct their mistake by redacting any confidential information from the public record. *See* Dkt. 75. Thus, striking these paragraphs is unnecessary and improper, and TxDOT's request is **OVERRULED**.

### 3.  Exhibit 22

TxDOT argues Exhibit 22 is inadmissible hearsay as excerpts of testimony in a different civil action because Plaintiffs introduce the statements for the truth of the matter asserted in Paragraphs 35 and 111 of the response. *See* Dkt. 71 at 3. TxDOT also argues Plaintiffs have not

---

[2] The Court notes that an exception to the hearsay rule likely could apply to the identified Exhibits; however, as Plaintiffs have failed to assert any hearsay exception, the Court declines to consider any other exceptions at this time.

established the declarants are unavailable to give testimony in this cause, and there is "no indication as to the identification of witnesses making statements." Dkt. 71 at 3.

Plaintiffs argue the statements are not hearsay because they are made by TxDOT's representatives and fall into a hearsay exception because both witnesses testified that they did not recall their previous testimony, given at trial, or the details regarding it. *See* Dkt. 75 at 1 (citing FED. R. EVID. 804(a)(3) and 804(b)(1)(A)). TxDOT provides no further argument. As Plaintiffs have answered TxDOT's challenges, and shown, at least as presented to the Court in limited form, apparent entitlement to a hearsay exception, TxDOT's objection as to Exhibit 22 is **OVERRULED**.

## B. TxDOT'S ADDITIONAL EVIDENCE

TxDOT attached additional evidence to its reply in support of the Motion. *See* Dkt. 72-1. In their sur-reply, Plaintiffs object to the Court considering the evidence attached to the reply, arguing Plaintiffs were not afforded a fair opportunity to respond to the additional arguments and evidence. *See* Dkt. 76 at 1. Accordingly, Plaintiffs argue the Court should strike the additional evidence from the summary judgment record. *See id.*

As stated in *Metzler v. XPO Logistics, Inc.*, there is no provision of the Federal Rules of Civil Procedures or the Local Rules of the Eastern District of Texas prohibiting the filing of evidence in a reply brief. *See Metzler v. XPO Logistics, Inc.*, Case No. 4:13-CV-278, 2014 WL 4792984, at *5 (E.D. Tex. Sept. 25, 2014). According to the Fifth Circuit, "Rule 56(c) merely requires the court to give the non-movant an adequate opportunity to respond prior to a ruling." *Southwestern Bell Tel. Co. v. City of El Paso*, 346 F.3d 541, 545 (5th Cir. 2003). As Plaintiffs filed a sur-reply, Plaintiffs had an adequate opportunity to respond to the arguments in and evidence

attached to TxDOT's reply. *See* Dkt. 76. Therefore, the Court finds Plaintiffs' objection is **OVERRULED**.

## IV. <u>ANALYSIS</u>

### A. TIME-BARRED CLAIMS

TxDOT argues any of Plaintiffs' claims based on events from 2015 and early 2016 should be dismissed as time barred. *See* Dkt. 56 at 13. In response, Plaintiffs argue they are not pursuing untimely or unpled claims, but assert they will "rely on such evidence of disparate discriminatory or retaliatory actions that occurred prior to the actionable period given that the Court allows for the consideration of such relevant background evidence." Dkt. 62 at 3 n.1.

For a Title VII claim to be timely, "the alleged discriminatory conduct must have occurred less than 300 days prior to the filing of the EEOC Charge." *Wantou v. Wal-Mart Stores Texas*, LLC, 2018 WL 1308221, at *7 (E.D. Tex. Feb. 15, 2018) (citing 42 U.S.C. § 2000e-5(e)(1)). Plaintiffs filed their charges of discrimination with the EEOC on September 19, 2017. *See* Dkt. 56-1 at 7–9. Thus, the Court will not consider any allegedly discriminatory acts that occurred prior to November 23, 2016, as anything more than background evidence.

### B. HORNE'S DISCRIMINATION CLAIM UNDER TITLE VII

Title VII provides, "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a); *accord Fort Bend County, Texas v. Davis*, 139 S.Ct. 1843, 1846 (2019).

A claim based on Title VII discrimination typically follows the modified *McDonnell Douglas* approach, in which a plaintiff must first demonstrate a *prima facie* case of discrimination.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir. 2006); *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). In order to establish a *prima facie* case of discrimination, the plaintiff must show: (1) he is a member of a protected group; (2) he was qualified for the position; (3) an adverse employment action occurred; and (4) he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances. *Wesley v. General Drivers, Warehousemen and Helpers Local 745,* 660 F.3d 211, 213 (5th Cir. 2011); *see also McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281 (5th Cir. 2004); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993).

Once established, the *prima facie* case raises a presumption of discrimination which the defendant must rebut by articulating a legitimate, nondiscriminatory reason for its actions. *Rachid*, 376 F.3d at 312; *see also Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 142 (2000); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–56 (1981). The burden on the employer at this stage is one of production, not persuasion, and does not involve any assessment of the employer's credibility. *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007).

Once the defendant produces evidence of a legitimate, nondiscriminatory reason for the adverse action, "the presumption of discrimination created by the plaintiff's *prima facie* case disappears and the plaintiff must meet its ultimate burden of persuasion on the issue of intentional discrimination." *Machinchick v. PB Power, Inc.,* 398 F.3d 345, 350 (5th Cir. 2005). Consequently, the burden shifts back to the plaintiff to show that either: (1) the defendant's reason is not true, but is instead designed to serve as pretext for unlawful discrimination; or (2) the defendant's reason, while true, is not the only reason for its conduct, and another "motivating factor" is the plaintiff's

protected characteristic.  *Id.* at 351–52; *Rachid,* 376 F.3d at 312 (citation omitted).  "[T]he plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer." *McCoy,* 492 F.3d at 556–57. This burden-shifting rubric applies to all of Plaintiffs' discrimination and retaliation claims.

### 1.  **Horne's *Prima Facie* Case**

TxDOT argues Horne has failed to establish that he is a member of a protected class, was subjected to an adverse employment action, and was treated less favorably than similarly situated non-protected employees. *See* Dkt. 56 at 15. Horne argues he has established a genuine issue of material fact as to all elements of his *prima facie* case. *See* Dkt. 62 at 18–22.

#### a.  Member of a Protected Class

TxDOT argues Horne has failed to provide any evidence that he is Native American. *See* Dkt. 56 at 15. Horne argues he has established he is a member of a protected class because he represented himself to be Native American. *See* Dkt. 62 at 18.

In support of its argument that Horne is not Native American, TxDOT points to Horne's testimony that he is not a registered member of his tribe and does not participate in any tribe cultural activities. *See* Dkt. 56-1 at 33–34. TxDOT has provided the Court with no case law to support its argument that only registered members of Native American tribes are considered "Native American" for Title VII purposes. Further, the evidence before the Court shows that Evans believed Horne to be Native American and informed Traylor of Horne's race. *See* Dkt. 62-2 at 40. Therefore, the Court finds Horne has established a genuine issue of material fact as to whether he is a member of a protected class.

b. <u>Adverse Employment Action</u>

TxDOT argues Horne cannot establish his transfer or alleged harassment was an adverse action. *See* Dkt. 56 at 15; Dkt. 72 at 2. Horne argues he suffered multiple employment actions: (1) consistent harassment, (2) being given physically dangerous work assignments, and (3) the twelve-month probation and unpaid five-day suspension for a false allegation. *See* Dkt. 62 at 20.

For employment discrimination claims under Title VII, the Fifth Circuit has held that adverse employment actions "include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *Welsh v. Fort Bend Independent School District*, 941 F.3d 818, 824 (5th Cir. 2019) (quoting *McCoy*, 492 F.3d at 559). "[A]n employment action that does not affect job duties, compensation, or benefits is not an adverse employment action."[3] *Pegram*, 361 F.3d at 282 (quotations omitted).

The evidence before the Court provides that Horne received twelve months of probation and a five-day suspension without pay for allegedly drawing a bullseye on Gray's back. *See* Dkt. 56-3 at 82. As part of his probation, Horne was not eligible for any merit-based increase in pay until six-months after his probation was completed. *See* Dkt. 56-4 at 97. While Horne was approved for a raise during his probationary period, Horne never received a pay increase prior to his retirement. *See* Dkt. 56 at 15. As the record reflects that Horne's probation and five-day suspension without pay affected Horne's compensation, the Court finds that a genuine issue of material fact exists as to whether Horne suffered an adverse employment action.

---

[3] As Plaintiff's allegations of constant harassment and dangerous work assignments do not affect Horne's job duties, compensation, or benefits, the Court will address these arguments in considering Horne's hostile work environment claim.

c.   <u>Treated Less Favorably than Similarly Situated Employees</u>

TxDOT argues Horne cannot show he was treated differently than a similarly situated comparator because Horne has not named a comparator and he was the only Sign Technician III in the Sulphur Springs Yard. *See* Dkt. 56 at 17. Horne argues he was treated differently than all of the white employees in the Sulphur Springs Yard who worked under Traylor. *See* Dkt. 62 at 21–22.

"'Similarly situated' employees are employees who are treated more favorably in 'nearly identical' circumstances; the Fifth Circuit defines 'similarly situated' narrowly." *See Lopez v. Kempthorne*, 684 F. Supp. 2d 827, 856–57 (S.D. Tex. 2010) (citing *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005)). "Similarly situated individuals must be 'nearly identical' and must fall outside the plaintiff's protective class." *Id.* (quoting *Wheeler*, 415 F.3d at 405). Where different decision makers or supervisors are involved, their decisions are rarely "similarly situated" in relevant ways for establishing a *prima facie* case. *See Thompson v. Exxon Mobil Corp.*, 344 F. Supp. 2d 971 (E.D. Tex. 2004); *see also Perez v. Tex. Dep't of Crim. Justice, Inst'l Div.*, 395 F.3d 206, 213 (5th Cir. 2004) ("We . . . have explained consistently that for employees to be similarly situated those employees' circumstances, including their misconduct, must have been 'nearly identical.'"); *Hockman v. Westward Comms., LLC*, 282 F. Supp. 2d 512, 527–28 (E.D. Tex. 2003) ("The 'nearly identical' standard, when applied at the *McDonnell Douglas* pretext stage is a stringent standard—employees with different responsibilities, different supervisors, different capabilities, different work rule violations or different disciplinary records are not considered to be 'nearly identical.'") (citing *Okoye v. Univ. of Tex. Houston Health Science Center*, 245 F.3d 507, 514 (5th Cir. 2001)).

The parties do not dispute that Horne was the only Sign Technician III in the Sulphur

Springs Yard. *See* Dkt. 56-1 at 29. However, employees that "shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories" are generally considered similarly situated even if they do not have the same job titles. *Lee v. Kan. City S. Ry.*, 574 F.3d 253, 260 (5th Cir. 2009). Thus, Horne's status as the only Sign Technician III in the Sulphur Springs Yard does not preclude him from establishing this element of his *prima facie* case.

Horne argues he has established this element of his *prima facie* case because no white employees were disciplined after the Clean Slate Speech for an allegation regarding conduct that allegedly occurred prior to the Clean Slate Speech. *See* Dkt. 62 at 20. In support of this argument, Horne points to testimony from several coworkers stating Horne was unfairly punished after the Clean Slate Speech. *See* Dkt. 62-2 at 54–55; Dkt. 62-3 at 28.

Horne has provided evidence that other TxDOT employees who were supervised by Traylor were not disciplined for similar offenses as Horne was disciplined; for instance, a white TxDOT employee allegedly said the "n word" in the office and TxDOT management did not investigate the incident or place the employee on probation or suspension. *See* Dkt. 63 at 17. According to the Supreme Court, "[t]he burden of establishing a *prima facie* case of disparate treatment is not onerous." *Burdine*, 450 U.S. at 253. As Horne has provided testimony from other TxDOT employees that Horne received worse treatment than other employees supervised by Traylor, the Court finds Horne has established a genuine issue of material fact as to the fourth element of his *prima facie* case of discrimination.

### 2.  Legitimate Non-Discriminatory Reason for Adverse Employment Action

TxDOT argues it had a legitimate, nondiscriminatory reason for placing Horne on probation for twelve months and suspending him for five days without pay, as Horne had allegedly

drawn a target on Gray's back and said "bullseye." *See* Dkt. 72 at 7–8.

As set forth above, Horne was found to have made the Good/Destroy List, wherein he listed Traylor, Lappin, and Taylor as "destroy." Dkt. 56-1 at 66. When the Good/Destroy List was brought to TxDOT's attention, TxDOT issued a reprimand to Horne and warned him against any further behavior that could be considered a threat. *See* Dkt. 56-3 at 16. Then, TxDOT received a report from Lappin that Horne drew a target on Gray's back a couple months prior. *See* Dkt. 56-2 at 33. After TxDOT conducted an investigation into Lappin's allegations regarding the bullseye, Paramanantham placed Horne on twelve months of probation with a five-day suspension without pay because multiple witnesses confirmed that Horne drew a target on Gray's back, and TxDOT felt that any of threat of violence or physical aggression is not acceptable in the workplace. *See* Dkt. 56-4 at 111. Because of the evidence provided above, the Court finds TxDOT has met its burden by providing the Court with a legitimate, nondiscriminatory reason for Horne's suspension and probation.

### 3. Pretext

Horne argues genuine issues of material fact exist as to whether TxDOT's stated reasons for placing him on probation and suspending him without pay were pretexts for its actual discriminatory motives. *See* Dkt. 62 at 23.

"A plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 378–79 (5th Cir. 2010) (quotations omitted). To show pretext, a plaintiff "must rebut each nondiscriminatory reason articulated by the employer." *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).

Horne has provided evidence that Horne, Richards, Carrell, and other TxDOT employees

told management in various interviews and investigations that Horne was treated differently by Traylor than other employees. *See* Dkt. 62-2 at 29, 39; Dkt. 63 at 17. Further, Horne has produced evidence that Traylor told Evans he was going to break Horne "like a wild Bronc." *See* Dkt. 63 at 17; Dkt. 62-2 at 40. Race-based remarks are probative of discriminatory intent so long as they are not the only evidence of pretext. *See Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 577 (5th Cir. 2003). Traylor's remark could be associated with Horne's Native American heritage, and Traylor was in the position to influence any decision to place Horne on suspension or probation. *See id.* at 578. Horne further points to the failure of TxDOT to investigate his claim of discrimination in the Letter. *See* Dkt. 62-8 at 3. Additionally, Horne points to the timing of the *Daniels* trial,[4] and argues that TxDOT was motivated to silence any further complaints of discrimination when it knew it was about to face trial. *See* Dkt. 62-5 at 48. Based on the foregoing, the Court finds a genuine issue of material fact exists as to whether TxDOT's proffered legitimate, nondiscriminatory reason for placing Horne on probation and suspension was pretext for discrimination. Thus, summary judgment is **DENIED** as to Horne's discrimination claim.

## C.  HORNE'S HOSTILE WORK ENVIRONMENT CLAIM UNDER TITLE VII

Title VII makes it unlawful for employers to require "people to work in a discriminatorily hostile or abusive environment." *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 325 (5th Cir. 2019). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e-5(3)(1)). To survive summary

---

[4] Beginning on January 10, 2017, TxDOT went to trial defending discrimination claims brought by Jeff Daniels ("Daniels"), a former TxDOT employee under Traylor. *See* Dkt. 62-5 at 48; *Jeffery Daniels v. Texas Department of Transportation*, Case No. 4:15-CV-702. TxDOT claimed in the *Daniels* case that Daniels was terminated for being disrespectful to Traylor and another TxDOT supervisor. *See id.* at 50. On January 18, 2017, the jury found that TxDOT had discriminated against Daniels based on his race. *See* Dkt. 62-7 at 19.

judgment on a hostile work environment claim based on race discrimination, a plaintiff must show that (1) he is a member of a protected class; (2) he suffered unwelcomed harassment; (3) the harassment was based on his membership in a protected class; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassment and failed to take prompt remedial action. *See West v. City of Houston, Texas*, 960 F.3d 736, 741 (5th Cir. 2020) (citing *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).

TxDOT argues Horne failed to assert a claim of hostile work environment in his EEOC Charge. *See* Dkt. 56 at 24. TxDOT further argues Horne has failed to provide any evidence that he was subjected to unwelcomed harassment based on his race that affected a term or condition of his employment. *See* Dkt. 72 at 20–21.

### 1. **EEOC Charge**

In the Motion, TxDOT argues Horne did not properly assert a claim of hostile work environment in his EEOC Charge, and thus, such claim should be dismissed for failure to exhaust administrative remedies. *See* Dkt. 56 at 24. In Horne's EEOC Charge, Horne states: "Shortly after Clint Traylor became the Maintenance Supervisor in 2015, Mr. Traylor began to treat me differently than all of the other employees subjecting me to different terms and conditions of employment and *pervasive harassment on an almost daily basis*." Dkt. 31-1 at 2 (emphasis added). "The scope of a Title VII complaint is limited to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Thomas v. Texas Dept. of Criminal Justice*, 220 F.3d 389, 395 (5th Cir. 2000). As Horne specifically asserts that he was subject to pervasive harassment in his EEOC Charge, and harassment is a central element of a hostile work environment claim under Title VII, the Court finds that Horne exhausted his administrative remedies as to his hostile work environment claim.

### 2. **Hostile Work Environment**

Upon review of TxDOT's Motion and reply, TxDOT disputes that Horne is a member of a protected class, Horne suffered unwelcome harassment, such harassment was based on Horne's race, and such harassment affected the terms or conditions of Horne's employment. *See* Dkt. 56 at 23; Dkt. 72 at 20–21. As the Court has already found that Horne established a genuine issue of material fact as to whether he is a member of a protected class, the Court will analyze the remaining elements of Horne's claim.

#### a. Unwelcomed Harassment

"If the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22 (1993). During his interview with Carleen, Horne allegedly complained of his treatment by Traylor. *See* Dkt. 63 at 29. Horne later wrote in the Letter that others have described his treatment as "harassment," and Horne stated, "you do not treat family like I have been treated the past year and a half." Dkt. 56-3 at 87. Horne testified in his deposition that he felt like Traylor was constantly harassing and discriminating against him. Dkt. 56-1 at 42, 51. Thus, the Court finds there is sufficient evidence to establish a genuine issue of material fact as to whether Horne felt he was experiencing a hostile work environment.

#### b. Harassment Based on Race

To support a hostile work environment claim under Title VII, harassment must be based on the plaintiff's membership in a protected class. *See West*, 960 F.3d at 741. Horne argues he was harassed by Traylor because he is Native American. Horne bases his argument on his status as the only non-white employee in the Sulphur Springs Yard and the testimony of his co-workers that he

was treated differently than every other employee. *See* Dkt. 62-2 at 29, 39; Dkt. 63 at 17. Further, Traylor allegedly told Evans he was going to break Horne "like a wild Bronc," which, as noted above, could be associated with Horne's Native American heritage. *See* Dkt. 63 at 17; Dkt. 62-2 at 40. As Horne has provided evidence that he was the only non-white employee and the only employee subject to Traylor's alleged harassment, and Traylor allegedly made a race-based remark, the Court finds a genuine issue of material fact exists as to whether Traylor's alleged harassment of Horne was based on his race.

c.  Harassment Affected Term or Condition of Employment

"To affect a term, condition, or privilege of employment, the harassment must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *West*, 960 F.3d at 742 (quoting *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 479 (5th Cir. 2008)). "The totality of the employment circumstances determines whether an environment is objectively hostile." *Id.* "Although no single factor is determinative, pertinent considerations are (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotations omitted).

Horne argues he was subject to constant harassment and Traylor regularly gave Horne dangerous work assignments. *See* Dkt. 62 at 20. Horne produced evidence that Traylor made Horne leave the Yard earlier and return later in the workday than any other Sulphur Springs employee. *See* Dkt. 62-3 at 25. Horne testified that he felt Traylor was constantly approaching him with an "aggressive attitude," as Traylor would "[get] up close in [his face]" and they "both had raised [their] voices at each other." Dkt. 56-1 at 32, 42, 51. Additionally, Horne provided testimony that

Traylor would send him alone to work on the sign truck when the equipment necessary for the job required two people. *See* Dkt. 62-2 at 20–21, 51–53. Several of Horne's co-workers testified that they observed Horne was "get[ting] hurt" performing this work alone, and when they each asked Traylor if they could help Horne, Traylor replied that Horne had to do the work by himself. *Id.* at 51–53; Dkt. 62-3 at 3–5.

Horne has provided evidence to support his allegation that he suffered harassment "constantly," and deposition testimony shows that many of his coworkers noticed how differently Traylor treated him compared to everyone else. Further, the evidence shows that this alleged harassment involved Traylor assigning Horne physically dangerous work. Thus, the Court finds that Horne has established a genuine issue of material fact as to whether he suffered harassment sufficient enough to affect a term, condition, or privilege of employment.

### d.   TxDOT's Knowledge of Harassment

Horne has produced evidence that he complained of his treatment by Traylor during his interview with Carleen and about his treatment and "harassment" in the Letter; hence, the Court finds that a genuine issue of material fact exists as to whether TxDOT knew or should have known about the harassment and failed to take remedial action. Thus, summary judgment is **DENIED** on Horne's hostile work environment claim.

### D.  PLAINTIFFS' RETALIATION UNDER TITLE VII

The Fifth Circuit has held that the *McDonnell Douglas* burden-shifting framework applies in Title VII retaliation cases. *See Canada v. Texas Mutual Insurance Company*, 766 F.App'x 74, 80 (5th Cir. 2019). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: (1) he participated in a protected activity under Title VII, (2) he suffered an adverse employment action, and (3) there is a causal connection between the protected activity and the

adverse action. *See Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 331 (5th Cir. 2009). If the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to proffer a legitimate, nonretaliatory reason for its actions. *See Strong v. University Healthcare System, L.L.C.*, 482 F.3d 802, 805 (5th Cir. 2007). The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the adverse action was taken against him not for the reasons stated by the defendant, but in retaliation for the plaintiff's protected activity. *See id*. at 806. "The proper standard of proof on the causation element of a Title VII retaliation claim is that the adverse employment action taken against the plaintiff would not have occurred 'but for' [his] protected conduct." *Septimus v. University of Houston*, 399 F.3d 601, 608 (5th Cir. 2005).

### 1.  Plaintiffs' *Prima Facie* Case Under Title VII

TxDOT argues Plaintiffs cannot establish any element of their *prima facie* case. *See* Dkt. 56 at 17. Specifically, TxDOT argues Plaintiffs have failed to show they engaged in a protected activity, suffered an adverse action, and that a causal connection exists between their alleged protected activities and the adverse action. *See id*. at 17–20.

#### a.  Engaged in Protected Activity

TxDOT argues no Plaintiff engaged in a protected activity as defined by Title VII because none of the Plaintiffs reported any discrimination, retaliation, or harassment through the TxDOT process. *See* Dkt. 56 at 17. Plaintiffs allege they each opposed Traylor's disparate treatment of Horne by making complaints to various TxDOT officials. *See* Dkt. 62 at 27–28.

"An employee has engaged in protected activity when [he] has (1) opposed any practice made an unlawful employment practice by Title VII or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII." *Thompson v. Somervell County, Tex.*, 431 F.App'x 338, 341 (5th Cir. 2011) (quoting *Douglas v.*

*DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 372 (5th Cir. 1998)). "When an employee communicates to [his] employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." *Id.* (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009)).

Plaintiffs produced evidence that they each complained to Evans about Traylor's discriminatory treatment of Horne prior to Evans' retirement. *See* Dkt. 62-2 at 29, 39. During his interview as part of the investigation, Horne told TxDOT interviewers that he believed Traylor and Taylor were out to destroy his career, and Richards told interviewers that the supervisors at the Sulphur Springs Yard had a double standard and did not hold everyone equally accountable to the rules. *See* Dkt. 62-7 at 15. Plaintiffs produced evidence that McCleskey, one of their assistant supervisors, had observed both Richards and Carrell complaining about Traylor's mistreatment of Horne. *See* Dkt. 62-4 at 82. Plaintiffs produced evidence that co-workers believed Plaintiffs were being singled out by TxDOT "because [Plaintiffs] call out things that are wrong." Dkt. 63 at 8, 30. Additionally, Horne stated in his Letter that he was facing retaliation. *See* Dkt. 56-3 at 87. Thus, the Court finds Plaintiffs have established a genuine issue of material fact as to whether they each engaged in protected activity under Title VII.

b.  Adverse Employment Activity

TxDOT argues Plaintiffs cannot show their transfers were adverse employment actions. *See* Dkt. 56 at 18. Plaintiffs allege the investigation and resulting involuntary transfers of Plaintiffs to different locations amounted to adverse employment actions. *See* Dkt. 62 at 29.

A retaliation claim may rest on an action that "a reasonable employee would have found . . . [to be] materially adverse, which in this context means it well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination." *Aryain*, 534 F.3d at 484 (quoting *Burlington N. Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Allegations that amount to "petty slights, minor annoyances, and simple lack of good manners" do not rise to the level of material adversity. *White*, 548 U.S. at 68.

When TxDOT previously offered Plaintiffs the opportunity to voluntarily transfer away from the Sulphur Springs Yard, each Plaintiff declined the offer. *See* Dkt. 56-3 at 24, 83. When TxDOT involuntary transferred Plaintiffs away from the Sulphur Springs Yard approximately two months later, the Work Location Transfer Memorandum provided to each Plaintiff states that their "behavior continues to be unprofessional and disruptive to the workplace" despite previous counseling. *See* Dkt. 56-4 at 99–104. The Work Location Transfer Memorandums go on to state that they are being issued "to maintain a productive and safe work environment." *Id*. Thus, a reasonable jury could find Plaintiffs were transferred and separated as a form of discipline. Additionally, Plaintiffs provided testimony from fellow employees that involuntary transfers were viewed as embarrassing and isolating. *See* Dkt. 62-3 at 7–9. Based on the foregoing, the Court finds that Plaintiffs have established a genuine issue of material fact as to whether their involuntary transfers would have dissuaded a reasonable worker from opposing discrimination.

      c.  <u>Causal Connection</u>

TxDOT argues that even if Plaintiffs have established the first two elements of their *prima facie* case, Plaintiffs have failed to establish that a causal connection exists between Plaintiffs' protected activity and the adverse employment action. *See* Dkt. 56 at 20.

To satisfy the "causal link" requirement of a Title VII retaliation claim, "an employee must provide substantial evidence that 'but for' exercising protected rights, [he] would not have been discharged." *Wheat v. Florida Parish Juvenile Justice Com'n*, 811 F.3d 702, 705 (5th Cir. 2016)

(citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). "Courts have found that to establish a *prima facie* case, plaintiffs may rely solely on temporal proximity between protected activity and an adverse employment action only if the two are very close." *Zamora v. City of Houston*, 798 F.3d 326, 335 (5th Cir. 2015).

Plaintiffs argue the causal connection between their complaints of Traylor's discrimination of Horne and their involuntary transfers is illustrated by the fact that Plaintiffs were transferred less than one month following TxDOT's receipt of Horne's Letter. *See* Dkt. 56-3 at 86–87; Dkt. 56-4 at 99–104. Plaintiffs also point to TxDOT's failure to investigate Horne's allegations of discrimination and retaliation in the Letter. *See* Dkt. 62-8 at 3. Plaintiffs further contend they were transferred within approximately one month of a jury finding that TxDOT engaged in unlawful discrimination in the *Daniels* case. *See* Dkt. 62-7 at 19. Because of the short temporal proximity between Plaintiffs' complaints and the involuntary transfers, the Court finds a genuine issue of material fact exists as to the last element of Plaintiffs' *prima facie* case.

### 2.  Non-Retaliatory Reason for Adverse Employment Action

TxDOT argues it transferred each Plaintiff because they contributed to the stressful work environment in the Sulphur Springs Yard, and a lack of comradery among the employees could threaten the safety of the office. *See* Dkt. 72 at 24. TxDOT produced testimony of Ganong that, after interviewing TxDOT employees in the investigation, he concluded employees felt "Horne, Carrell, and Richards were creating a stressful work environment." Dkt. 56-4 at 116. After receiving reports that Plaintiffs were continuing to cause division in the office after the conclusion of the investigation, Paramanantham testified he made the decision to transfer Plaintiffs to provide the employees in the Sulphur Spring Yard with a productive work environment. *See id.* at 111–12.

31

Based on the foregoing, the Court finds TxDOT has met its burden in providing a legitimate, nonretaliatory reason for transferring Plaintiffs to different offices.

### 3. Pretext

Plaintiffs allege TxDOT's proffered reason for transferring Plaintiffs was pretext for retaliation, and TxDOT was motivated to take action against Plaintiffs in order to silence any additional complaints of discrimination during and following the *Daniels* trial. *See* Dkt. 62 at 32. First, Plaintiffs point to the fact that TxDOT did not conduct any investigation into the alleged complaints following the investigation that allegedly lead Paramanantham to transfer Plaintiffs. *See* Dkt. 56-4 at 111–12. Additionally, Plaintiffs point to TxDOT's failure to investigate Horne's claim of discrimination and retaliation in the Letter as evidence that Plaintiffs were transferred in order to silence any potential claims of discrimination. *See* Dkt. 62-8 at 3. Plaintiffs also point to the timing of the transfers, as Plaintiffs were separated and involuntarily transferred less than a month after a jury found TxDOT engaged in unlawful discrimination. *See* Dkt. 62-7 at 19. Based on the evidence presented, the Court finds Plaintiffs have established a genuine issue of material fact as to whether TxDOT's proffered reason for Plaintiffs' transfers was pretext for retaliation and meant to silence Plaintiffs' allegations. Thus, summary judgment is **DENIED** as to Plaintiffs' retaliation claims.

### V.   CONCLUSION

Based on the foregoing, the Court finds TxDOT's Motion for Summary Judgment (Dkt. 56) is **DENIED**.

**So ORDERED and SIGNED this 24th day of September, 2020.**

KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE

32